**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X
IRIS HILLEL,                                          :
                                                      :          Civil Case No.
                          Plaintiff,                  :
                                                      :
              v.                                      :          **COMPLAINT**
                                                      :
OBVIO HEALTH USA, INC., OBVIO                          :
HEALTH PTE. LTD., SPRIM AMERICAS,                     :          **Jury Trial Demanded**
INC., IQVIA, INC., MICHAEL SHLEIFER,                  :
PRASANNA PITALE, ALISTAIR                             :
GRENFELL, DIKLA SHPANGENTAL, and                      :
ANAND THARMARATNAM, in their                          :
individual and professional capacities,               :
                                                      :
                          Defendants.                 :
-------------------------------------------------------------X

Plaintiff Iris Hillel hereby alleges, by and through her undersigned counsel, Wigdor LLP,

as and for her Complaint against Defendants Obvio Health USA, Inc. and Obvio Health Pte. Ltd.

(together "ObvioHealth," or the "Company"), SPRIM Americas, Inc. ("SPRIM"), IQVIA, Inc.

("IQVIA"), Michael Shleifer, Prasanna Pitale, Alistair Grenfell, Dikla Shpangental and Anand

Tharmaratnam (together, "Defendants") as follows:

### PRELIMINARY STATEMENT

1.      Ms. Hillel brings this action seeking injunctive, declaratory and monetary relief

against Defendants for violations of the New York State Human Rights Law, N.Y. Exec. Law §§

290 *et seq*. ("NYSHRL"), the New York City Human Rights Law, New York City Admin. Code

§§ 8-101 *et seq*. ("NYCHRL"), defamation and tortious interference with Plaintiff's employment

and contract with ObvioHealth and SPRIM.

## JURISDICTION AND VENUE

2.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of residence of the named parties and the amount in controversy exceeds $75,000.

3.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PREREQUISITES

4.     Ms. Hillel will file a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), as well as Title VII as amended by the Pregnancy Discrimination Act ("PDA").  As soon as the EEOC completes its investigation into Ms. Hillel's complaint and/or issues a Notice of Right to Sue, Ms. Hillel will seek leave to amend this Complaint to add Title VII and PDA claims against ObvioHealth and SPRIM.

5.     Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, thereby satisfying the notice requirements of that section.

6.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

7.     Plaintiff Iris Hillel is a former Chief Executive Officer ("CEO") of ObvioHealth. At all relevant times, Ms. Hillel worked at the New York office of the Company.  Ms. Hillel is a resident of the State of New York and, at all relevant times herein, met the definition of an "employee" under all relevant statutes.

2

8.     Defendant Obvio Health USA, Inc. is a foreign business corporation that was incorporated outside of New York and has a principal place of business located at 3452 Lake Lynda Drive, Bldg 100, Suite 151, Orlando, Florida 32817.  At all relevant times, Obvio Health USA, Inc. was an "employer" within the meaning of all applicable statutes.

9.     Defendant Obvio Health Pte. Ltd. is a foreign business corporation that was incorporated outside of New York and has a principal place of business located at 79 Science Park Drive, Singapore 118264.  At all relevant times, Obvio Health Pte. Ltd. was an "employer" within the meaning of all applicable statutes.

10.     Defendant SPRIM Americas, Inc. is a foreign business corporation that was incorporated outside of New York and has a principal place of business located at 3452 Lake Lynda Drive, Building 100, Suite 151, Orlando, Florida 32817.  At all relevant times, SPRIM was an "employer" within the meaning of all applicable statutes.

11.     Defendant IQVIA, Inc., is a foreign business corporation that was incorporated outside of New York and has a principal place of business located at 83 Wooster Heights Road Danbury, Connecticut, 06810.  At all relevant times, IQVIA was an "employer" within the meaning of all applicable statutes.

12.     Defendant Michael Shleifer ("Shleifer") is the Co-Founder and Managing Partner of SPRIM.  Mr. Shleifer is a citizen and resident of Singapore and, at all relevant times, supervised Plaintiff's employment and met the definition of Plaintiff's "employer" under all relevant statutes.

13.     Defendant Prasanna Pitale ("Pitale") is the Senior Vice President of Global Consumer Health at IQVIA and is a member of the Board of Directors at ObvioHealth.  Mr. Pitale is a citizen and resident of England.

14.    Defendant Alistair Grenfell ("Grenfell") is the President of IQVIA for Europe, the Middle East, Africa and South Asia.  Mr. Grenfell is a citizen and resident of England.

15.    Defendant Dikla Shpangental ("Shpangental") is the Vice President of IQVIA for Israel.  Ms. Shpangental is a citizen and resident of Israel.

16.    Anand Tharmaratnam ("Tharmaratnam") was the President of Asia Pacific for IQVIA.  Mr. Tharmaratnam is a resident of England.

## FACTUAL ALLEGATIONS

### I.    Background

17.    Ms. Hillel is an extremely accomplished individual whose list of achievements is too large to include here in its entirety.

18.    Ms. Hillel served in the Israel Defense Forces as a Naval Medic beginning in 1993, and later earned her Bachelor's Degree in Medical Science in 1999 from the Ben-Gurion University of the Negev in Israel.

19.    In 2000, she was certified as a Healthcare Research and Development Specialist by the Department of Health in Israel.

20.    In 2007 Ms. Hillel earned her Bachelor of Laws in International Law from the College of Management, Rishon Lettzion, in Israel, and became a Certified Mediator at the Neve-Tzedek Mediation Centre.

21.    Prior to joining ObvioHealth, Ms. Hillel had amassed over 24 years of relevant experience, including multiple C-suite healthcare leadership roles.

22.    In 2004, Ms. Hillel joined IMS Holdings Inc. ("IMS") as an Account Manager, and later was promoted to the position of Global Key Account Manager for Teva Pharmaceuticals, Ltd ("Teva") and performed the position of Country Manager for Israel.  While

employed at IMS, Ms. Hillel produced more than $75,000,000 in revenue to IMS with global annual double-digit growth, helped IMS win two significant market access consulting projects that helped Teva define its strategy in the developing markets, successfully transformed IMS as a sole data supplier into a full-service provider and generated more than $2,500,000 in revenue for IMS by creating a solution that allowed Teva to maximize usage of Global Sales and Rx data.

23.    From 2010 through 2012, Ms. Hillel worked with Quintiles Transnational Holdings Inc. ("Quintiles"), first as the Director of Strategic Partnership and later as the Global Vice President for Strategic Demand in the Global Management Group.   While there, Ms. Hillel generated more than $18,000,000 in revenue from new businesses within 18 months for both Quintiles and Kadrige, built a new business unit, collaborated on shared E-Detailing opportunities valued at $4,000,000 and won multiple projects with a combined value of more than $27,000,000 with major pharmaceutical companies by enabling the business unit to quickly adapt to different working standards, expectations and processes.

24.    After Ms. Hillel left Quintiles, IMS and Quintiles merged, and subsequently acquired Kadrige.  The combine organization was renamed IQVIA.

25.    From 2013 through 2015, Ms. Hillel was the Chief Innovation Officer for the DMD Marketing Corporation in Paris, France, where she led product innovation, operational turnarounds, cost reduction and account development.  While there, Ms. Hillel boosted multiple millions of dollars in revenue growth, increased efficiency by 80% and amplified pharma customer acquisition by 57%, adding more than $5,000,000 in new sales potential for existing clients.

26.    From 2015 through 2017, Ms. Hillel was the CEO of Orca USA Inc., where she ran market strategy and penetration, brand development, investor relations, revenue optimization,

growth management and strategic partnerships.  While there, Ms. Hillel produced sales from 50% of the nation's ophthalmology market, grew clients by more than 600%, secured a $1,500,000 multi-year agreement with a major vision correction laser chain and drove more than 100% month over month revenue growth.

27.     From 2017 to 2019, prior to her employment at ObvioHealth, Ms. Hillel worked as the CEO of Bio Alliances Holdings, Inc., driving healthcare innovation from research and development to commercialization by leveraging global experience across the USA, Europe, Australia and Asia while running the market strategy, strategic partnerships, strategy development and investor relations for the company.

28.     In summer 2019, Sunrise Consulting, the headhunters for ObvioHealth and SPRIM, contacted Ms. Hillel, while she was still employed with Bio Alliances Holdings, Inc., in order to aggressively recruit her for the role of CEO at ObvioHealth.  In August 2019, Ms. Hillel joined ObvioHealth and SPRIM, excited for the new opportunity awaiting her.

29.     ObvioHealth is effectively owned and operated by SPRIM.  ObvioHealth's own website states "As the parent company of ObvioHealth, SPRIM offers a solid foundation and important resources for conducting business in the global healthcare industry.  Founded in 2001, SPRIM has worked with some of the biggest Consumer-Packaged-Goods (CPG), Over-The-Counter (OTC), and Pharmaceutical companies in the world.  As a global life sciences management consulting firm and traditional CRO in 17 countries, SPRIM exists to help its clients innovate new products, analyze the global marketplace, and substantiate health claims.  Over the years of operation, and coinciding with the technology revolution, the founders of

SPRIM intuitively knew there was a better, faster way to help clients demonstrate product efficacy and substantiate their claims – the genesis of ObvioHealth."[1]

30.    During her short time with ObvioHealth and SPRIM, Ms. Hillel's accomplishments were remarkable, particularly given all of the various restrictions placed on her (as described in further detail below).  For example, Ms. Hillel was able to:

- Create a more efficient organizational chart;

- Optimize spending;

- Grow savings of $300,000 in 2019 to over $2,000,000 in total for the time period of 2019 through 2020;

- Reduce shared services fees by 22%;

- Increase sales from $700,000 in the fourth quarter of 2018 to $2,900,000 in the fourth quarter of 2019;

- Start the development of the Software as a Service model project;

- Implement a Sales Force CTMS system to facilitate accurate billing of project time and effort;

- Implement a certification process to ensure mandatory pharmaceutical grade compliance;

- Help secure an $8,000,000 investment and $47,000,000 commercial commitment from IQVIA, Inc. ("IQVIA");

- Represent and present on behalf of the Company to investors in a meeting held in Singapore; and

- Personally develop sales for ObvioHealth in the amount of $6,000,000, $21,000,000 and $100,000,000, all of which were slated to close after the date of Ms. Hillel's termination.

31.    In addition, Ms. Hillel was chosen by ObvioHealth and SPRIM employees as its most inspiring female leader.

---

[1]    See https://www.obviohealth.com/our-vision/.

## II.    Gender Discrimination at ObvioHealth and SPRIM

32.    Ms. Hillel's accomplishments at ObvioHealth and SPRIM are all the more remarkable given the rampant discriminatory and misogynistic behavior to which she was subjected by ObvioHealth and SPRIM's male leaders.  This behavior was first and foremost perpetrated by Mr. Shleifer, Co-Founder and Managing Partner of SPRIM, who demeaned and belittled female employees on a regular basis.

33.    During Ms. Hillel's very first week of employment, she attempted to discuss with Mr. Shleifer the fact that an outsourced IT vendor was charging ObvioHealth $250,000 a month, and that Ms. Hillel had no idea what they were being charged for.

34.    Upon broaching this conversation with Mr. Shleifer, he stated to Ms. Hillel "you need to calm down, I understand you are trying to prove you are a manager, but you need to relax and take it easy."

35.    Ms. Hillel told Mr. Shleifer that she did not know what he was referring to.  In response, Mr. Shleifer simply stated, "I understand that everything you do, you do well, but just take it easy, relax."  Of course, Mr. Shleifer never would have told a male executive to "calm down" or "relax," both of which perpetuate the stereotypical notion that women are quick to act in a hysterical fashion.

36.    This set the tone for how Ms. Hillel was going to be treated by Mr. Shleifer throughout her employment with ObvioHealth and SPRIM.  In addition, often when Ms. Hillel asked Mr. Shleifer a question, he made it clear that he was not interested in interacting with her and would respond curtly and push her off to Thomas Fratacci, SPRIM's Chief Financial Officer, or Ivan Jarry, SPRIM's Co-Founder and Managing Partner and ObvioHealth's current CEO.

37.     Mr. Shleifer's dismissive statements telling Ms. Hillel to "calm down" or "relax" are akin to an environment where professional women are referred to as aggressive or described as overreacting.

38.     Mr. Shleifer never used such language to describe male executives, and these attacks were directed at Ms. Hillel when she was doing nothing more than executing her responsibilities as CEO.  Of course, men are routinely aggressive in the workplace and are praised and rewarded for such conduct.  However, when women are perceived to have acted aggressively, it is often the case that they receive discriminatory backlash and are "put in their place."  Indeed, as explained by Justice William J. Brennan, Jr. in an opinion written in the case of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989):

> An employer who objects to aggressiveness in women but whose positions require this trait puts women in an intolerable and impermissible Catch 22: out of a job if they behave aggressively and out of a job if they do not.  [The anti-discrimination laws] lift[] women out of this bind.

See also https://www.forbes.com/sites/nextavenue/2018/08/28/when-women-are-called-aggressive-at-work/#4ec045287bc8.

39.     In late August 2019, Ms. Hillel attended a meeting with Mr. Shleifer, Mr. Fratacci, Mr. Pitale and Mr. Tharmaratnam.

40.     Following the meeting, Mr. Fratacci left in order to attend another meeting. Subsequently, Mr. Shleifer invited Mr. Pitale and Mr. Tharmaratnam to go out to lunch and asked Ms. Hillel to "wait for [them]."

41.     Ms. Hillel felt extremely uncomfortable that she would be excluded from this business lunch for no reason that was clear to her.

9

42.    Ms. Hillel asked Mr. Shleifer why she had been excluded from the lunch and explained that it would give IQVIA a clear message that Ms. Hillel did not have the ability to make independent decisions, and would demonstrate that her opinions and presence were inconsequential.

43.    In response, Mr. Shleifer dismissed Ms. Hillel, stating that he was excluding her because he had known these executives prior to this meeting.

44.    Ms. Hillel expressed that she had known Mr. Pitale for over 15 years.

45.    Mr. Shleifer dismissed Ms. Hillel's concerns yet again and told her not to "worry about it."

46.    Ms. Hillel brought her complaints about Mr. Shleifer's actions to Mr. Jarry that same day, but he also dismissed her complaints.

47.    In November 2019, Ms. Hillel, Mr. Shleifer, James Hendrick, the ObvioHealth Chief of Staff, Dan Brenner, CEO of 1NHealth, and Mr. Jarry participated in a meeting with three individuals from IQVIA.

48.    During this meeting, Mr. Shleifer continually undermined Ms. Hillel.

49.    After this meeting, Mr. Shleifer stated to Ms. Hillel "don't you find it weird that you are the only woman in the room?"

50.    Ms. Hillel, having worked for years in a male driven work environment, stated that she did not find it weird, and that she was used to working with men.

51.    In response, Mr. Shleifer stated to Ms. Hillel, "**I think it is very weird that you are the only woman, I think that a male CEO would make more sense.  This kind of discussion should be held with men.**"

52.     After Mr. Brenner had left the room, Mr. Shleifer began to speak to Ms. Hillel in an aggressive tone and raised his voice in front of Mr. Hendrick and Mr. Jarry, criticizing her with baseless accusations.

53.     Later, Mr. Jarry conceded that Mr. Shleifer acted inappropriately by speaking to Ms. Hillel like that in front of Mr. Hendrick.

54.     On or about February 11, 2020, Ms. Hillel, Mr. Shleifer, Laurent Benissan, Managing Partner of SPRIM, and Mr. Jarry participated in a budget review with employees from Tikehau Capital ("TKO").  Prior to this meeting, Mr. Fratacci had sent Ms. Hillel a document to present to the group.

55.     During this presentation, Mr. Shleifer repeatedly humiliated, insulted and demeaned Ms. Hillel, responding to every single point she made by stating, "this is bullshit, this is wrong, this is never going to happen, this is the worst idea ever."

56.     Ms. Hillel was horrified by this interaction, especially because it was occurring in front of TKO employees.  Later in that meeting, Mr. Shleifer changed his view completely and said "actually, what could be cool is to…" and then repeated the points Ms. Hillel had just presented moments before.

57.     When Ms. Hillel informed Mr. Shleifer that the ideas he had presented to her were identical to those that she had just presented, he responded "yes, now when I think about it, it makes sense.  Actually, it is a great idea."

58.     After the meeting, Ms. Hillel was shocked and confused and asked Mr. Jarry what caused Mr. Shleifer to change his opinion so suddenly.  In response, Mr. Jarry told Ms. Hillel that Mr. Shleifer just wanted to "show TKO what kind of people they would have to deal with

and that it is not so easy to manage" and that Mr. Shleifer was "just like this, one minute he is all upset and then he is happy."

59.    Of course, it was completely inappropriate for Mr. Shleifer to attempt to convey how tough and masculine he is by demeaning Ms. Hillel in front of her colleagues and industry partners.

60.    A couple weeks before Ms. Hillel was terminated, she was finalizing a deal with a company in Israel, CH-Health, which would be worth $6,000,000.  After a conference call with CH-Health's female Chief Financial Officer, Mr. Shleifer stated, "that is not going to lead anywhere," insinuating to Ms. Hillel that he believed the relationship was not worth pursuing because it was being initiated by a woman.

61.    This type of discriminatory behavior also was perpetrated by other members of ObvioHealth and SPRIM's male leadership.

62.     Jeff Evitts, SPRIM's Chief Sales Officer, would often comment on Ms. Hillel's appearance or about her facial expressions, regularly telling her that she "shouldn't look worried" and that she "should smile."

63.    Craig Gravina, SPRIM's Chief Technology Officer, would make remarks about Ms. Hillel's physical appearance, including statements to the effect of, "you look stunning" or "you look great."  During a business conversation in the last week of February 2020, Mr. Gravina touched Ms. Hillel's shoulders inappropriately.  Ms. Hillel became extremely uncomfortable and told Mr. Gravina that she did not like to be touched.

64.    The foregoing discriminatory conduct is unfortunately the foreseeable result of ObvioHealth and SPRIM's male dominated leadership teams.  By way of example only, of the seven venture companies controlled by SPRIM only one is currently led by a woman, Mr.

Shleifer's wife.  Among SPRIM's six partners, five are men, the only female partner is Mr.

Shleifer's wife and all three managing partners are men.

65.     Ms. Hillel made a concerted effort to hire and retain women into leadership, much

to the chagrin of SPRIM's leadership.

66.     On multiple occasions, SPRIM leadership attempted to push Ms. Hillel into

removing the few women leaders from their positions.

67.     One example is Erin Haumann, Managing Director, APAC at ObvioHealth,

whom Mr. Shleifer had been trying to replace even prior to Ms. Hillel's arrival.  Ms. Haumann

informed Ms. Hillel that after she had started with the Company, Mr. Shleifer told Ms. Haumann

that if he "knew that this is the way [she] looked, [he] would have never hired [Ms. Haumann]."

68.     Ms. Haumann repeatedly told Ms. Hillel that Mr. Shleifer was cruel and short

with her.

69.     Eventually, Ms. Haumann told Ms. Hillel that she was going to resign because of

SPRIM management's behavior.

70.     Upon Ms. Hillel's insistence, Ms. Haumann ultimately decided to reconsider her

resignation and remain with the Company.

71.     Similarly, Claire Fives, Vice President of Clinical Operations for ObvioHealth,

also experienced great difficulty working with Mr. Shleifer.  Mr. Shleifer treated Ms. Fives akin

to an assistant, regularly asking her to complete activities that were not a part of her job.  Mr.

Shleifer would often talk down to Ms. Fives.

72.     Ms. Hillel believed that Ms. Fives was a good project manager and refused to

terminate her.

73.     Eventually, Ms. Fives resigned.

74.     Finally, on multiple occasions Mr. Jarry recommended that Ms. Hillel terminate Kimberly Parsons, the Senior Vice President and Head of Clinical Operations for ObvioHealth. Despite Ms. Hillel's insistence that Ms. Parsons was doing a good job and provided value, Mr. Jarry eventually forced Ms. Hillel to terminate Ms. Parsons.

### III.     Ms. Hillel Reports Financial Improprieties

75.     Soon after starting at ObvioHealth, Ms. Hillel began noticing financial improprieties relating to ObvioHealth's relationship with SPRIM.

76.     SPRIM controlled all aspects of ObvioHealth's operations and monetary allocations.

77.     While familiarizing herself with ObvioHealth's profits and losses, Ms. Hillel realized that $2,650,000 was being paid to SPRIM for "Shared Services."

78.     These invoices were being sent by Mr. Fratacci and Mr. Jarry.  These payments were allegedly fees SPRIM charged to ObvioHealth for SPRIM's provision of certain services, including "rent" for occupying a SPRIM shared rent building, accounting, marketing and fundraising services supposedly provided by SPRIM, fees for SPRIM management's time and travel costs, and more.

79.     However, anyone with a basic understanding of the operations of ObvioHealth could note that the amount being charged by SPRIM was outrageous for a start-up company with 23 employees, most of whom were working from home.

80.     Additionally, many of the services for which ObvioHealth was being charged plainly were not being provided by SPRIM, and actually were being provided by ObvioHealth's own employees.

14

81.    Upon realizing this, Ms. Hillel made multiple requests over her tenure at ObvioHealth for additional details relating to these charges.  Ms. Hillel never received them, and Mr. Fratacci and Mr. Jarry regularly forced her to sign quarterly contracts that allowed SPRIM to essentially loot ObvioHealth.

82.    Every time Ms. Hillel would push back on these charges, Mr. Fratacci and Mr. Jarry would give her the same speech; namely, that it was too late to discuss the charges, that she did not have a choice, that Mr. Jarry knew he needed to reduce the charges and that Mr. Jarry would try to reduce the fees in the next quarter.

83.    Ms. Hillel was never given the details relating to these charges.

84.    Additionally, on multiple occasions, Ms. Hillel asked Robert Bailey, ObvioHealth's Head of Finance, for the ability to review ObvioHealth's credit card fees.  She was never given the opportunity to do so.

85.    Ms. Hillel was given very limited access to ObvioHealth's finances and bank accounts, which is wildly unusual since she was the CEO.

86.    When Ms. Hillel first started at ObvioHealth, there was a bank account that contained $95,000 in Japan.  Ms. Hillel repeatedly asked Mr. Fratacci and Mr. Bailey to transfer the money in this account back to the United States because there was no longer ObvioHealth employees in Japan that needed to be paid.

87.    Both Mr. Fratacci and Mr. Bailey repeatedly told Ms. Hillel that they would send her the information, but they never did.

88.    In January 2020, Mr. Fratacci told Ms. Hillel that there was no money in that bank account.  When Ms. Hillel pushed back and inquired as to where the money had disappeared,

Ms. Fratacci bore down, lying and stating, "no, no, no, that was a mistake, there was nothing there."

89.    The discriminatory behavior and belittling to which Ms. Hillel was subjected to also occurred in connection with investigating and attempting to resolve the financial improprieties at ObvioHealth and SPRIM.

90.    By way of example only, Rodney Cheung, the Chief Information Officer for both SPRIM and ObvioHealth, repeatedly stated that Ms. Hillel did not know what she was talking about when Ms. Hillel questioned the amount of money ObvioHealth was spending on an external IT vendor.

91.    Mr. Cheung repeatedly spoke ill about Ms. Hillel to other ObvioHealth and SPRIM employees as a result.

92.    Eventually, ObvioHealth hired an external consulting firm which confirmed that the IT vendor was not delivering the product they committed to, nor could they justify the vast expenditure.

93.    On February 15, 2020, Ms. Hillel noticed that ObvioHealth was charged SG$70,000 by SPRIM for SQR Labs' rent.

94.    SQR Labs is a project that is wholly unrelated to ObvioHealth.  On March 2, 2020, only three days prior to Ms. Hillel's termination, Ms. Hillel approached Mr. Fratacci and asked him to cancel the SG$70,000 that they were charged.

95.    Mr. Fratacci laughed in her face.

96.    When Ms. Hillel asked for an explanation as to why this fee was being charged to ObvioHealth, Mr. Fratacci told her that the amount was for "the rent fee for the ObvioHealth employees in Singapore."

97.     To Ms. Hillel's knowledge, there were no ObvioHealth employees in Singapore, and at most there could have been one employee there.

98.     On top of this, SPRIM had already charged rent to ObvioHealth as part of the immense Shared Services charges.  Ms. Hillel informed Mr. Fratacci of this, telling him that SPRIM could not just charge the Company money for nothing.

99.     Mr. Fratacci simply told her "we will take care of it."  On March 11, 2020 Ms. Hillel followed up with Mr. Fratacci, reiterating that he needed to reimburse the Company for the SG$70,000 that they were charged.

## IV.     Ms. Hillel is Defamed by Employees of IQVIA

100.    As noted above, between 2004 and 2012, Ms. Hillel worked for both Quintiles and IMS, which later merged to become IQVIA.

101.    Ms. Hillel decided to resign from IMS after they asked her to work from home and IMS closed offices in 30 countries.

102.    When Ms. Hillel joined ObvioHealth, the Company was in the process of negotiating a large deal with IQVIA.

103.    Because she had advanced knowledge of both Quintiles and IMS, Ms. Hillel began working on the deal immediately.  She worked closely to advance the deal with Mr. Pitale, as well as with the IQVIA legal team.

104.    However, only one week after Ms. Hillel joined ObvioHealth, Mr. Shleifer, and Laurent Benissan, another Managing Partner of SPRIM, informed Ms. Hillel that Mr. Tharmaratnam had defamed her by telling them that Ms. Hillel had been fired from IMS.

105.    This accusation was and is a blatantly false misrepresentation.

17

106.    As a result of this defamatory statement, Ms. Hillel was forced to show her new employer a copy of her resignation letter to assure them that she was telling the truth about her resignation from IMS.

107.    Despite this first defamatory statement, through the end of 2019, Ms. Hillel experienced great success in her working relationship with IQVIA.

108.    On December 20, 2019, Mr. Jarry called Ms. Hillel and stated that Mr. Pitale informed him of two additional defamatory and tortious statements.

109.    First, that Mr. Grenfell, the President of IQVIA for Europe, the Middle East, Africa and South Asia, did not want Ms. Hillel to work with IQVIA in Europe.

110.    Second, that Ms. Shpangental, Vice President of IQVIA for Israel, stated that she would not attend any meetings with ObvioHealth if Ms. Hillel was going to be present.

111.    Ms. Hillel was dumbfounded, as she had never had any issues working with any of these individuals, and these statements were clear misrepresentations of Ms. Hillel's relationships with individuals at IQVIA.

112.    On February 13, 2020, Ms. Hillel sent Mr. Jarry an email outlining her interactions with Mr. Grenfell and Ms. Shpangental, stating that she did not know the source of their concerns, particularly given the fact that Ms. Hillel had never met Ms. Shpangental and that she had previously had a great working relationship with Mr. Grenfell at IMS.

113.    As for the former, Ms. Hillel had not only never met Ms. Shpangental, but they did not even work at IMS at the same time.

114.    As for the latter, Ms. Hillel had worked with Mr. Grenfell when she was a Global Key Account Manager for Teva at IMS.  During this time, she created and signed three years of global agreements with Teva, closed countless deals worth many millions of dollars and four

18

times she won the IMS award for best performance at their "100 Percent Club."  In reference to the global agreement that Ms. Hillel created with Teva, Mr. Grenfell stated that "it was the best contract [he] ha[d] ever seen."  In the last annual business plan for IMS during Ms. Hillel's employment, Teva grew their spend with IMS by approximately 30% under her leadership, making Ms. Hillel one of the top performing Global Key Account Managers at that time.

115.    Under Ms. Hillel's leadership, Teva increased its spend with IMS from annual to quarterly.  In some countries, Teva increased its spend to monthly MIDAS data, representing 93% of IMS MIDAS data available globally.  This was to the great satisfaction of Mr. Pitale, who lead the MIDAS data department.

116.    It is therefore incredulous that Mr. Grenfell or Ms. Shpangental would be speaking ill of Ms. Hillel to Mr. Pitale.

117.    Ms. Hillel also expressed to Mr. Jarry her concern that she had been removed from all communications in the wake of a significant collaboration with IQVIA, a relationship with which she was heavily involved in since she joined ObvioHealth.

118.    Despite her regular persistence, Ms. Hillel never got an email response from Mr. Jarry.

119.    Instead, after the deal with IQVIA had closed on February 13, 2020, Mr. Jarry asked Ms. Hillel to nominate another person in the Company to work with IQVIA, but insisted that she had nothing to worry about.

## V.    **Ms. Hillel Reports Her Pregnancy to the Company**

120.    On February 5, 2020, Ms. Hillel informed Mr. Jarry that she was pregnant *via* email.

121.    In response, Mr. Jarry asked Ms. Hillel whether she had made a typo or whether she was, in fact, pregnant.  Ms. Hillel assured Mr. Jarry that she was in the early stages of her pregnancy.

122.    Almost immediately, it became apparent to Ms. Hillel that other members of SPRIM management were aware of her pregnancy even though she had not disclosed her pregnancy to them.

123.    Ms. Hillel observed an obvious shift in the behavior of her colleagues.

124.    For example, Mr. Shleifer and Mr. Jarry took away many of Ms. Hillel's job responsibilities, including excluding her from discussions and agreements, and going over her head with respect to decisions that were previously in her purview.

125.    By way of example, in the second week of March 2020, when COVID-19 began to spread in the United States, Mr. Gravina planned an ObvioHealth and SPRIM meeting in Orlando, Florida without seeking Ms. Hillel's approval.

126.    Moreover, Ms. Hillel was told that this meeting would be a conference call for IT employees only, but when she joined the call, she observed that there were approximately eight people located in the same room in Florida, six of whom were ObvioHealth employees.[2]

127.    Additionally, SPRIM employees began communicating with the finance and marketing teams directly, circumventing Ms. Hillel.

128.    Ms. Hillel repeatedly tried to speak about the budget with Mr. Fratacci and was simply ignored.

---

[2]    As an aside, this resulted in several Company employees being infected with COVID-19.

129.    Also following the disclosure of Ms. Hillel's pregnancy, Mr. Shleifer began requiring Ms. Hillel to complete work that could and should have been handled by a secretary, and certainly was not fit for a CEO.

130.    By way of further example, in mid-February, Mr. Fratacci and Mr. Jarry informed Ms. Hillel that Mr. Jarry had reviewed the first quarter budget of ObvioHealth without Ms. Hillel, the CEO, participating.

131.    When Ms. Hillel questioned this decision, Mr. Jarry simply dismissed her, stating that Mr. Jarry was "looking at something else and just did it without [her]."

## VI.    **Ms. Hillel is Unlawfully Terminated**

132.    On March 23, 2020, Ms. Hillel was supposed to have a call with Mr. Jarry and Cheryl Walter, Chief Talent Officer at SPRIM.

133.    Ms. Hillel had started her morning with a meeting with a client in Israel, and as she was driving home, she was in a car accident and had to be hospitalized.

134.    Ms. Hillel reached out to Mr. Jarry, informing Mr. Jarry of her accident and subsequent hospitalization.

135.    A couple of hours later, Ms. Hillel received an email from Ms. Walter stating, "I am very sorry to hear that you were in an accident earlier today and hope that you are not hurt. Unfortunately, the Company had planned to inform you today of your termination from your position at ObvioHealth."

136.    The email attached a termination letter, which read, in part, "[t]his correspondence will serve as notice of the termination of your employment pursuant to Paragraph 3.2 of your Employment Agreement in light of the fact you are unable to perform or

execute the full range of duties expected of the Chief Executive Officer of Obvio Health USA, Inc., specifically, any work involving IQVIA."

137. With total disregard for Ms. Hillel's wellbeing, she was terminated *via* email while she was hospitalized following a car accident.

138. Moreover, Ms. Hillel experienced a miscarriage as a result of the accident.

139. The reaction from SPRIM and ObvioHealth employees following Ms. Hillel's termination was telling. Ms. Hillel received between 20 or 30 text messages from different individuals expressing their shock at her termination.

140. It is readily apparent that any purported reasons for Ms. Hillel's termination stem from unlawful discriminatory and retaliatory animus, as well as the defamatory comments made by IQVIA.

**<u>FIRST CAUSE OF ACTION</u>**
**(Discrimination in Violation of the NYSHRL)**
***Against ObvioHealth, SPRIM and Shleifer***

141. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

142. By the actions described above, among others, Defendants ObvioHealth, SPRIM and Mr. Shleifer discriminated against Plaintiff based on her gender and/or pregnancy in violation of the NYSHRL, including, but not limited to, by subjecting Plaintiff to a hostile work environment and by terminating Plaintiff's employment.

143. As a direct and proximate result of Defendants ObvioHealth, SPRIM and Mr. Shleifer's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

22

144.    As a direct and proximate result Defendants ObvioHealth, SPRIM and Mr. Shleifer's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

145.    Plaintiff is further entitled to an award of punitive damages as Defendants ObvioHealth, SPRIM and Mr. Shleifer's unlawful conduct was and remains reckless, wanton and/or malicious.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against ObvioHealth, SPRIM and Shleifer*

146.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

147.    By the actions described above, Defendants ObvioHealth, SPRIM and Shleifer retaliated against Plaintiff based on her protected activities in violation of the NYSHRL, including, but not limited to, by terminating Plaintiff's employment.

148.    As a direct and proximate result of Defendants ObvioHealth, SPRIM and Shleifer's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

149.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

150.    Plaintiff is further entitled to an award of punitive damages as Defendants ObvioHealth, SPRIM and Shleifer's unlawful conduct was and remains reckless, wanton and/or malicious.

## THIRD CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYSHRL)
### *Against Defendant Shleifer*

151.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

152.    Defendant Shleifer knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYSHRL.

153.    As a direct and proximate result of the unlawful conduct of Defendant Shleifer in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

154.    As a direct and proximate result of the unlawful conduct of Defendant Shleifer, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

155.    Plaintiff is further entitled to an award of punitive damages as Defendant Shleifer's unlawful conduct was and remains reckless, wanton and/or malicious.

## FOURTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
### *Against Defendants ObvioHealth, SPRIM and Shleifer*

156.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

157.    Defendants ObvioHealth, SPRIM and Shleifer have discriminated against Plaintiff on the basis of her gender and/or pregnancy in violation of the NYCHRL by, *inter alia*,

24

denying her the equal terms and conditions of employment, removing her from deals and terminating her employment because of her gender and/or pregnancy.

158. As a direct and proximate result of Defendants ObvioHealth, SPRIM and Shleifer's unlawful discriminatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

159. As a direct and proximate result of Defendants ObvioHealth, SPRIM and Shleifer's unlawful discriminatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

160. Defendants ObvioHealth, SPRIM and Shleifer's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
*Against Defendants ObvioHealth, SPRIM and Shleifer*

161. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

162. By the actions described above, among others, Defendants ObvioHealth, SPRIM and Shleifer have retaliated against Plaintiff by, *inter alia*, terminating her employment.

163. As a direct and proximate result of Defendants ObvioHealth, SPRIM and Shleifer's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

164.     As a direct and proximate result of Defendants ObvioHealth, SPRIM and Shleifer's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

165.     Defendants ObvioHealth, SPRIM and Shleifer's unlawful and retaliatory actions constitute knowing, malicious, willful, wanton and reckless violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Defamation)
### *Against Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam*

166.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

167.     As described above, Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam have stated false information regarding, *inter alia*, the circumstances surrounding Ms. Hillel's employment with IMS.

168.     These statements were untrue and defamatory in that they falsely reported, *inter alia*, that Ms. Hillel was terminated from her position at IMS, and were made with the intent to harm Plaintiff professionally.

169.     Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam knew or should have known that such defamatory statements were false.

170.     Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

26

171.     Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam's statements constitute defamation because they impugn Plaintiff's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely claiming, *inter alia*, that Plaintiff was fired from her previous employment and that senior leadership at IQVIA refused to work with Plaintiff.

172.     Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam's defamatory statements have harmed Plaintiff's professional reputation and standing in her industry, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and opportunities for career advancement, and have caused her embarrassment, humiliation and emotional injury.

173.     As a direct and proximate result of Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam's defamation, Plaintiff has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

174.     As a direct and proximate result of Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam's conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

175.     Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Hillel's rights.  As such, Ms. Hillel is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Defamation Per Se)**
*Against Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam*

176.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

27

177.    As described above, Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam have stated false information regarding, *inter alia*, the circumstances surrounding Ms. Hillel's employment at IMS.

178.    These statements were untrue and defamatory in that they falsely reported, *inter alia*, that Plaintiff had a poor working relationship with Grenfell, Shpangental, Tharmaratnam and her former employer, IMS.  The statements were made with the intent to harm Ms. Hillel professionally.

179.    Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam knew or should have known that such defamatory statements were false.

180.    Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

181.    Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam's statements constitute defamation *per se* because they impugn Plaintiff's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely claiming, *inter alia*, that Plaintiff had a poor working-relationship with IQVIA employees and IMS.

182.    Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam's defamatory statements have harmed Plaintiff's professional reputation and standing in her industry, have caused her economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and opportunities for career advancement, and have caused her embarrassment, humiliation and emotional injury.

183.    As a direct and proximate result of Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam's defamation, Plaintiff has suffered, and continues to suffer,

from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and emotional distress.

184.    As a direct and proximate result of Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam's conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

185.    Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Ms. Hillel's rights.  As such, Plaintiff is entitled to an award of punitive damages.

**EIGHTH CAUSE OF ACTION**
**(Tortious Interference with Prospective Economic Relations)**
*Against Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam*

186.    Plaintiff hereby repeats and re-alleges each allegation contained in each preceding paragraphs as if fully set forth herein.

187.    Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam had direct knowledge of Plaintiff's business relationships with her employers at SPRIM and ObvioHealth.

188.    Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam intentionally interfered with this business relationship of Plaintiff for wrongful purposes and, as a direct result of Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam's conduct, Plaintiff's employment relationship with this third party has been injured and her employment opportunities and prospects with it.

189.    Defendants IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam acted solely out of malice, and/or used dishonest, unfair, and improper means to interfere with Plaintiff's business relationships.

29

190.   As a direct result of Defendant IQVIA, Pitale, Grenfell, Shpangental and Tharmaratnam's conduct, Plaintiff has suffered, and will continue to suffer, substantial damages as follows:

> A.   Plaintiff has suffered, and continues to suffer, harm to her career development within the healthcare industry;
>
> B.   Plaintiff has suffered, and continues to suffer, harm to her professional and personal reputations which has resulted in lost job and business opportunities; and
>
> C.   Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, loss of self-esteem and self-confidence, loss of career fulfillment, and continual stress, anxiety, uncertainty over her ability to meet personal and familial financial obligations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.   A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.   An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.   An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.   An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.      An award of punitive damages, in an amount to be determined at trial;

F.      An award of liquidated damages, in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: June 17, 2020
        New York, New York                    Respectfully submitted,

                                              **WIGDOR LLP**

                                              By:  _____
                                                    Michael J. Willemin
                                                    Lindsay M. Goldbrum

                                              85 Fifth Avenue
                                              New York, NY 10003
                                              Telephone:  (212) 257-6800
                                              Facsimile:   (212) 257-6845
                                              mwillemin@wigdorlaw.com
                                              lgoldbrum@wigdorlaw.com

                                              *Counsel for Plaintiff*

31